UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

JAMIE ORSINI and
NICHOLAS ORSINI

Defendants.

23 Cr. 402 (PMH)

**Government's Memorandum of Law Opposing Defendants
Jamie Orsini and Nicholas Orsini's Post-Trial Motions for a
Judgment of Acquittal and a New Trial**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
50 Main Street – Suite 1100
White Plains, New York 10606

Kaiya Arroyo
Michael D. Maimin
Kathryn P. Wheelock
Assistant United States Attorneys
- Of Counsel -

**Table of Contents**

I.      Preliminary Statement ................................................................................. 1

I.      Background ................................................................................................. 2

        A.      The Evidence at Trial .............................................................................. 2

                1.      Background: The Orsinis and Steven Kraft ................................. 3

                2.      Planning the Murder .................................................................... 4

                        a.      April 26, 2020: Two Days Before the Murder ................... 4

                        b.      April 27, 2020: The Day Before the Murder ...................... 7

                3.      April 28: The Orsinis Murder Kraft, Taking His Car—as
                        Planned—as They Do So ............................................................ 7

                        a.      Just Before the Murder ...................................................... 7

                        b.      The Murder .......................................................................... 9

                        c.      Nicholas Dumps Kraft's Car and Phone(s) ...................... 10

                4.      The Aftermath of the Murder, Including the Cover-Up ............. 16

                        a.      The Orsinis Buy a New Burner Phone and Travel
                                to and from Amsterdam, New York ................................. 16

                        b.      The Orsinis Get Nervous and Burn Materials in
                                their Backyard ................................................................... 18

                        c.      The Orsini's Statements to the Police and Others .......... 20

                        d.      The Orsinis Return to the One of the Scenes of the
                                Crime .................................................................................. 22

II.     Argument .................................................................................................. 24

        A.      There Was Sufficient Evidence of the Orsinis' Guilt ............................ 24

                1.      Applicable Law .......................................................................... 24

                        a.      Rule 29 Standard .............................................................. 24

                        b.      Rule 33 Standard .............................................................. 26

|  | c. | Carjacking and Conspiracy ............................................... 27 |

|  | 2. | Discussion .......................................................................... 29 |

| B. | There Is No Basis to Grant a New Trial ................................................ 36 |

|  | 1. | This Court Properly Admitted Evidence of the Orsinis' Preparation for, and Cover-Up, of Their Crimes ....................... 37 |

|  | 2. | This Court Instructed the Jury Properly ................................... 39 |

| C. | Section 2119 Is Not Unconstitutionally Vague ..................................... 41 |

|  | 1. | Applicable Law ......................................................................... 42 |

|  | 2. | Discussion .............................................................................. 44 |

| III. | Conclusion ............................................................................................... 48 |

The Government respectfully submits this memorandum of law in opposition to defendants Jamie and Nicholas Orsini's[1] motions for a judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. (Docket Entries 118–21).[2] Because the evidence at trial was more than sufficient to support the jury's guilty verdict, this Court committed no error, and the Federal carjacking statute is not unconstitutionally vague, this Court should deny the Orsinis' motions.

## I.    Preliminary Statement

Between at least April 26 and May 9, 2020, Jamie and Nicholas Orsini planned to—and did—murder Jamie's ex-husband Steven Kraft, steal his car, and cover it up. The Orsinis' attempts to hide their crimes were unsuccessful and a grand jury indicted both defendants for (1) committing a carjacking resulting in the death of Steven Kraft, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2119(3) and 2; and (2) participating in a conspiracy to commit a carjacking, in violation of 18 U.S.C. § 371. (Superseding Indictment ¶¶ 1–4).

---

[1] Because the defendants share the same last name, for the ease of the reader, this memorandum refers to them by their first names when discussing each individually.

[2] "Docket Entry" refers to an entry on this Court's docket in this case; "Indictment" refers to superseding indictment S1 23 Cr. 402 (PMH), which is available at Docket Entry 38; "[Name] Br." refers to the named defendant's brief in support of his or her post-trial motions, which briefs are available at Docket Entries 119 and 120; "Tr." refers to the transcript of the trial in this case; "GX" refers to a government exhibit admitted at that trial, and "DX" refers to a defense exhibit admitted at that trial. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

Trial began with jury selection on September 17, 2024. At trial, the Government presented overwhelming evidence of the Orsinis' guilt. On September 27, 2024, the jury returned a guilty verdict on all counts for both Orsinis.

Following that verdict, the Orsinis ask this Court to enter a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, to grant them a new trial, pursuant to Federal Rule of Criminal Procedure 33. In particular, the Orsinis argue that there was insufficient evidence for a reasonable jury to convict them. (Jamie Br. 11–14; Nicholas Br. 6–10). Moreover, Jamie argues that she merits a new trial because: (1) this Court should not have admitted evidence of purchases of items that the Orsinis purchased at Home Depot and Walmart (Jamie Br. 15–17); (2) the Court incorrectly instructed the jury regarding the required nexus between the Orsinis' murder of Kraft and taking of his car (Jamie Br. 17–21); and (3) the federal carjacking statute—18 U.S.C. § 2119—is unconstitutionally vague (Jamie Br. 21–24). Nicholas argues that he merits a new trial simply "because the evidence of Nicholas Orsini's guilt is remarkably unreliable." (Nicholas Br. 11). This Court can swiftly reject each of these arguments and deny the Orsinis' post-trial motions.

## I.    Background

### A.    The Evidence at Trial

At trial, the Government presented evidence establishing beyond a reasonable doubt that, following days of planning and preparation, on April 28, 2020, Jamie Orsini and Nicholas Orsini murdered Steven Kraft, forcibly taking his car in the process, drove the car into Newburgh, New York, and abandoned the vehicle to shift

suspicion from themselves. To do so, the Government presented evidence not only from the day of the murder, but also in the days and weeks leading up to and following the murder to establish how the defendants planned and attempted to cover up their crime.

### 1.    Background: The Orsinis and Steven Kraft

Jamie and Kraft met one another in 2003, when Kraft was in the United States Marine Corps, based in North Carolina. (GX 1006 ¶ 2). They were married from December 9, 2005, to May 22, 2012, and had two daughters, who were born in 2007 and 2009. (GX 1001 ¶ 1). During this time—from shortly after Jamie and Kraft's first daughter was born until January 2011, after their second daughter was born—Kraft went AWOL, and Kraft's father did not have contact with either Kraft or Jamie. (GX 1006 ¶¶ 2–5). While Jamie and Kraft were still married, Jamie had a son with Nicholas—who was raised in Amsterdam, New York—in 2011. (GX 1001 ¶ 2; GX 1004 ¶ 2). The Orsinis married one another on July 3, 2012—less than two weeks after Jamie and Kraft's marriage was dissolved—and they remain married today. (GX 1001 ¶ 2). The Orsinis had a second son in 2018. (GX 1001 ¶ 2).

During 2020, Jamie had primary custody of her daughters with Kraft, and Kraft had authorized visitation every Tuesday from 4:00 pm through 7:00 pm and every other Saturday from 12:00 pm through 3:00 pm. (GX 1001 ¶ 3). During April and May 2020, the Orsinis and all four of Jamie's children—the two daughters she had with Kraft and the two sons she had with Nicholas—lived in the rear apartment of 10 West Church Street, in Beacon, New York, which was accessed through the building's backyard. (GX 310–34, 1001 ¶ 4; Tr. 150–51, 185).

On March 5, 2020, Kraft filed a *pro se* request for a modification of the custody arrangements previously ordered in New York family court, specifically proposing "that [he] should have physical custody or that [he] should have 50/50 with having the girls on every Tuesday along with the 1st, 3rd, 4th weekend of every month + have 3 weeks of summer vacation; or that [he] be allowed to move back to Illinois + have my kids every summer + winter break also with current time of the year to see them." (GX 1001 ¶ 5). A court scheduled a hearing for June 10, 2020, to determine whether to modify the custody and visitation order regarding Jamie and Kraft's daughters. (GX 1001 ¶ 6). Kraft felt it looked like a court was going to give him more time and custody with his daughters, and he was excited about that. (GX 1006 ¶ 7).

### 2. Planning the Murder

#### a. April 26, 2020: Two Days Before the Murder

Two days before to Kraft's murder, the Orsinis began preparing for the murder and coverup: (1) traveling to Home Depot to purchase items that they would use to murder Kraft and conceal evidence; and (2) driving "dry runs"—both with and without their phones to see if they could be tracked—of the route that Nicholas would ultimately use to dispose of Kraft's car after killing him.

On April 26, 2022, at 9:32 a.m.,[3] as captured by video surveillance, the Orsinis' white GMC Envoy drove to and into the parking lot for the Home Depot in Fishkill, New York. (GX 175-B1, 330-2, 921 at 3, 1001, 1002, 1003). At 9:50 a.m., Jamie bought 1,000 square feet of plastic sheeting, a painter's coverall, disposable shoe guards, and

---

[3] Times are approximate.

25 yards of heavy-duty duct tape. (GX 171, 174-B1, 921 at 4). Minutes later, Jamie walked out of the Home Depot with the supplies and up to the GMC Envoy, where Nicholas got out and helped put the sheeting, coverall, shoe guards, and duct tape in the truck. (GX 175-B2, 921 at 5).

Rather than go home, the Orsinis drove to Newburgh, New York, as captured by their cellphone cell site data, their Google location data, and video surveillance. They drove over the Newburgh Beacon Bridge, into Newburgh, and then drove a circuitous route to the corner of Carpenter Avenue and Third Street, at the entrance of Downing Park. (GX 54, 55, 141-A, 142-A, 143-A, 144-A, 201, 901 at 12, 921 at 6–12, 1003).



*Figure 1 - GX 901 at 12*

As this Court knows, that location—the corner of Carpenter Avenue and Third Streets, at the entrance of Downing Park—is where Nicholas would ultimately dump Kraft's blue Toyota Camry. (GX 15 A-1, 300-1–300-13, 302-A, 302-B; Tr. 63, 70). Immediately after driving by the corner of Carpenter Avenue and Third Street, both

Orsinis—still carrying their cellphones—drove directly to their home at 10 West Church Street in Beacon, New York. (GX 202, 143-A, 144-A, 901 at 13, 921 at 16–17, 1003).

Several hours later, Jamie and Kraft's older daughter's cellphone traveled the same circuitous route to the corner of Carpenter Avenue and Third Street, and then returned to the Orsinis' home in Beacon, just as Nicholas and Jamie had driven earlier that day. (GX 901 at 14–15). Nicholas's phone stayed at home, and Jamie's phone was off, the entire time. (GX 901 at 14–15). The Orsini had installed Life360 on their daughter's phone, which allowed them to track the location of that phone, even historically. (GX 17-F; Tr. 695–96, 891–92).



*Figure 2 - GX 901 at 14*

### b.    April 27, 2020: The Day Before the Murder

The day before the murder, the Orsinis purchased a disposable "burner phone" that Nicholas would use to call a taxi after getting rid of Kraft's car the night of the murder.

At 11:25 am., the Orsinis' GMC Envoy drove into the Walmart/Sam's Club parking lot in Fishkill, New York. (GX 223-A, 901 at 16, 921 at 19, 1003). Ten minutes later, Nicholas bought two things at the Sam's Club using Jamie's Sam's Club card. (GX 221, 222-A, 921 at 20–21, 1003). But there was a problem: the things they bought at Sam's Club showed Jamie's name as the member. (GX 221, 921 at 21). So Nicholas walked across the parking lot and bought a disposable burner phone—with a phone number ending in 7755—at the Walmart in cash. (GX 261, 261-A, 901 at 16, 1003; Tr. 204).[4]

### 3.    April 28: The Orsinis Murder Kraft, Taking His Car—as Planned—as They Do So

### a.    Just Before the Murder

On April 28, 2020, Kraft went to work at Frank's Deli in Marlboro, New York, as he typically did, from 8:00 a.m. until approximately 2:00 p.m. (Tr. 40–43). Video surveillance and cellphone location data show that, at approximately 4:00 pm—the

---

[4] While there was no surveillance video of the Orsinis buying the 7755 burner phone, it was clear that they bought it. Among other things, Nicholas's phone went into the Walmart just before the burner phone was purchased and came out just after it was purchased (GX 901 at 16); the 7755 burner phone was with Nicholas and Jamie's phones when it was activated in the Dunkin' Donuts parking lot on the day of the murder (GX 901 at 20); and Nicholas used the burner phone to call a taxi from the Sunoco station in Newburgh after getting rid of Kraft's car (GX 703-J, 901 at 25, 911-A).

time he was scheduled to pick up his children for visitation—Kraft went to the Orsinis' home in Beacon, where his daughters lived, and then drove to Sonic in Newburgh. (GX 203, 204, 234-A1, 234-B1, 301-14, 501-T, 901 at17, 921 at 24–30, 1001, 1002, 1003). At 4:10:06 p.m., the older daughter's phone—which had Life360 on it, allowing the Orsinis to track it—first pinged off a cell tower by the Sonic. (GX 17-F, 901 at 17; Tr. 695–96, 891–92). As soon as the daughter's phone registered its location, the Orsinis began moving, driving to Sonic in Newburgh, getting there at 4:20 pm. (GX 206, 234-A1, 901 at 18, 921 at 30–31, 921 at 34, 1003).[5] Kraft ordered food at the Sonic—consistent with the order his daughter had written out—at 4:21 p.m., and waited at the drive-thru until 4:28 p.m. to get his food. (GX 231, 233-B1, 301-47–52, 921 at 32–33, 1003). Even though the Orsinis got to the Sonic at 4:20 p.m., they did not pull up to the drive-thru until literally seconds after Kraft got his food—after all, their primary purpose was to watch Kraft—ordering their food at 4:34 p.m. and getting it at 4:43 p.m. (GX 232, 234-A1, 234-B1, 901 at 18, 921 at 34–36, 1003).

Having gotten food for himself and his daughters, Kraft drove to his home in Marlboro, where he and his daughters ate their food together and spent time together. (GX 360-9, 901 at 19).

---

[5] The Orsinis' phones moved in reaction to their daughter's phone's location registering at 4:10:06 p.m. (GX 901 at 17). At 4:09 p.m.—just before their daughter's phone registered—Jamie's phone was still the Orsinis' home. (GX 901 at 18). At 4:11:12 p.m.—just over a minute after their daughter's phone registered near Sonic—Nicholas's phone was near the entrance of I-84, just north of the Orsinis' home, and the Orsinis' GMC Envoy then got onto the Newburgh Beacon Bridge. (GX 205, 901 at 18, 921 at 30, 1003). The Orsinis' phones traveled together. (GX 901 at 18).

The Orsinis, on the other hand, continued preparing for the murder and taking of the car. After getting their food, they drove to the parking lot of a Dunkin' Donuts in Newburgh where, sitting in their GMC Envoy, they activated the 7755 burner phone at 5:12 p.m. (GX 151-A, 703-J, 703-N, 723-A, 901 at 20, 921 at 37). They then went home to Beacon. (GX 206, 921 at 38–39, 1003). Having just activated the 7755 burner phone, Nicholas used his own Google account to search for "how does raid know device has raid." (GX 811-A, 913, 921 at 40; Tr. 793–94).[6] Nicholas was scheduled to show up at his job at Unilock at 6:00 p.m.; he did not show up at all that evening, and did not respond to texts from one of his colleagues at 6:08 p.m. and 6:43 p.m. (GX 258-A, 259-B, 911-A, 921 at 41–43; Tr. 681–82).

### b.    The Murder

Kraft drove his daughters back to the Orsinis' home in Beacon, arriving around 7:00 p.m., when he was scheduled to drop them off with their mother. (GX 207, 501-T, 510-AT, 510-BT, 510-KT, 901 at 21, 23, 921 at 44–45, 1001, 1003). Kraft had two phones: a Samsung J3 and a Samsung S10. (GX 15, 15-A1, 706-C, 802-B1, 802-C1, 802-D1, 802-E1, 802-F2, 804-B1, 804-E1, 913; Tr. 69, 856–61). However, Jamie admitted after the murder that she only knew that Kraft had one phone. (GX 501-T).

From 7:00 p.m. to 8:44 p.m., Kraft's J3 phone—which, as this Court knows, was eventually found in the console of Kraft's car (Tr. 69–70; GX 15)—remained just outside the Orsini's house, in the car, while Kraft's S10 phone went into the Orsinis'

---

[6] "Raid: Shadow Legends" was an online game that Nicholas played frequently on his mobile phone and sought to install on his burner phones. (Tr. 439–42, 451–52, 680–81, 684, 795–96, 1087, 1107, 1111; GX 259-B).

home with Kraft; the Orsinis' phones were also in their home (GX 901 at 23). At 7:47 p.m., Nicholas's colleague texted him again: "?" after receiving no response to his prior messages. (GX 259-B, 911-A, 921 at 47; Tr. 681–82). Nicholas did not respond for 23 minutes; and then, at 8:10 pm, wrote falsely: "Yo my wife is broken down near harrimen[7] triple a covering the toe o can't get there now. I'll be there tomorrow," correcting "toe" to "tow" two minutes later. (GX 259-B, 911-A, 921 at 49; Tr. 681–82). At 8:15 p.m., Nicholas changed his excuse: "I'm putting the baby to sleep I'll answer if I can or call you back"; he did not answer or call back. (GX 259-B, 911-A, 921 at 49; Tr. 681–82). Also during this time, Jamie's oldest daughter—whose phone was, like Jamie's, Nicholas's, and Kraft's S10, in the Orsini's home in Beacon—texted Jamie twice, at 7:53 p.m., and 7:55 p.m.; Jamie did not respond. (GX 17-E, 911-A, 921 at 48; Tr. 693–94).

Kraft's friends and family have not seen or heard from him since. (GX 1006 ¶ 8; Tr. 49, 58).

### c.  Nicholas Dumps Kraft's Car and Phone(s)

Having murdered Kraft and taken control of his car, as planned, by doing so, the Orsinis had to get rid of Kraft's car and the phone they knew about—again, as planned. At 8:44 p.m., as caught on surveillance video, Kraft's car pulled out of West Church Street—where the Orsinis lived—and turned toward the Newburgh Beacon

---

[7] As the Court knows, and as the jury—selected from the northern counties of the Southern District of New York, knew—Harriman is a village about a 30-minute drive southwest of Beacon, on the other side of the Hudson River. Of course, when Nicholas sent this text, his phone—used to send the text—and Jamie's phone were both in their house in Beacon, along with Kraft's S10 phone. (GX 901 at 23).

Bridge. (GX 121, 921 at 52–53, 1003). Kraft's car—with both his J3 and S10 phones inside—drove precisely the same route to the corner of Carpenter Avenue and third Street in Newburgh that the Orsinis had driven twice two days earlier, as caught on surveillance videos as well as location data for the phones. (GX 131, 145, 146-A, 208, 212, 901 at 24–25, 921 at 54–64, 1003). At 9:00 p.m., Kraft's car—with the J3 phone in the console (Tr. 69–70; GX 15)—was left in front of a fire hydrant at the corner of Carpenter Avenue and Third Street, where it would later be found (GX 15 A-1, 300-1–13, 302-A, 302-B, 901 at 24–25, 921 at 156; Tr. 63, 70).

Having dumped Kraft's Toyota, Nicholas, carrying Kraft's S10 phone—the one that Kraft had brought with him into the Orsinis' home before they killed him—walked north to a gas station to get a taxi home. Starting at 9:02 p.m., a single person—captured on video surveillance—walked north on Robinson Avenue after dumping the car, carrying Kraft's S10 phone, passing by Youngest Brother Italian Restaurant at 9:14 p.m. (GX 281, 901 at 25, 921 at 65–66, 1003).



*Figure 3 - GX 281 at approximately 9:14 pm*

Just after passing Youngest Brother Italian Restaurant, at 9:14:39 p.m., Kraft's S10 phone stopped working; it was never found again. (GX 901 at 25). The man who was carrying that phone, however, continued walking, passing Dunkin' Donuts at 9:26 p.m., and then walking into the Sunoco gas station. (GX 152-A, 241-A, 241-B, 921 at 67–71, 1003).



*Figure 4 - GX 152-A at 9:26 pm*



*Figure 5 - GX 241-A at 9:29 pm*

As the man walked up to the Sunoco station, video surveillance showed that he was

talking on a cell phone, which he then threw away; seconds before, as he was walking

13

up to the station—at 9:28 p.m.—phone records and cell-site data showed that he turned on the Orsinis' 7755 burner phone and used it to call All Family Taxi—the taxi company the Orsini's had tried to call when they activated the phone earlier in the day—before turning it off and throwing it away. (GX 241-A, 241-B, 703-J, 901 at 25, 911-A, 921 at 69–71, 1003). The man then went into the gas station to buy a drink; video surveillance showed that he was wearing a Jets jersey with stripes on the sleeves, a Levi's Stadium hat, a patterned blue bandana, and blue latex gloves.[8] (GX 241-C, 241-D, 241-E, 241-E1, 921 at 72, 1003). That man was Nicholas: Jamie had a photo of Nicholas on her phone wearing precisely the same Jets jersey (GX 19-E; Tr. 407–08, 546, 921 at 73); and the police found a Levi's Stadium hat and patterned blue bandana—identical to the ones Nicholas wore into the Sunoco station on April 28, 2020—at the Orsinis' home in Amsterdam, New York, in August 2020 (GX 320-18–20, 921 at 179).[9]

---

[8] Contemporaneous video surveillance showed that, despite the pandemic, Nicholas did not normally wear gloves. (GX 175-B2, 176-B1, 176-B2, 179-B1, 181-B1, 182-B2, 183-B1, 185-B1, 222-A, 258-A, 264-A1). On the evening of April 28, 2020, however, Nicholas was clad head to toe, including wearing blue latex gloves, minimizing the amount of skin that was exposed and could leave trace evidence. (*See*, *e.g.*, Tr. 724 ("The premise behind the wearing of gloves is to limit the possibility of leaving behind evidence.")).

[9] There was additional evidence that that man was Nicholas. Among other things: (1) a mixture of surveillance video and location data for Kraft's S10 phone showed that he had walked alone from Kraft's Toyota—which had come from the Orsinis' home—to the Sunoco (GX 121, 131, 145, 146-A, 152-A, 208, 212, 241-A, 241-B, 281, 901 at 25, 1003)); (2) a mixture of surveillance video and call-log and location data for the Orsinis' 7755 burner phone showed that he had just used the Orsinis' 7755 burner phone to call All Family Taxi (GX 241-B, 703-J, 901 at 25, 911-A), which 7755 burner phone the Orsinis had activated while in their car at the Dunkin' Donuts earlier in the day, next to their own phones (GX 151-A, 901 at 20); and (3) video surveillance

An All Family Taxi van picked Nicholas up at the Sunoco station at 9:38 p.m. (GX 242-A, 242-B, 921 at 74–75, 1003). The All Family Taxi van: (1) left the Sunoco station at 9:39 p.m. (GX 242-C, 921 at 76–77, 1003); (2) crossed the Newburgh Beacon Bridge, getting off at 9:42 p.m. (GX 209, 921 at 80–81, 1003); (3) approached the Orsinis' home, driving east on Main Street (the block south of their block: Church Street) at 9:45 p.m. (GX 101, 1003); and (4) dropped Nicholas off at the Orsinis' home, pulling out of Church Street at 9:50 p.m. (GX 126). Even though Nicholas was at the Sunoco station, and then in the All Family Taxi van on his way home, not getting home until just before 9:50 p.m. (GX 126), Jamie used Nicholas's phone—which, along with Jamie's phone, was in the Orsinis' home the entire time between 8:45 p.m. and 11:51 p.m. (GX 901 at 27; Tr. 914)—to text Nicholas's mother at 9:39 p.m. (GX 16-I, 911-A, 921 at 78, 1001; Tr. 432, 444). (At that time, Nicholas was just leaving the Sunoco station, without his phone (GX 242-C, 921 at 76–77, 1003)).[10] Minutes later, at 9:47 p.m., Jamie used her phone to send Nicholas's phone two texts within 10 seconds of one another: "He's sleep … so come in the room so we can fuck" and "Bring a clean bottle." (GX 16-H, 911-A, 921 at 88; Tr. 432, 442–43). At 9:50 p.m.,

---

showed that he took an All Family Taxi back to the Orsinis' home in Beacon (GX 242-A, 242-B, 1003).

[10] Nicholas's phone texted Nicholas's mother "Did your stimulus come yet?" at 9:39 p.m.; Nicholas's mother texted back at 9:41 p.m.: "F-no… I don't know why…prob will get screwed out of it." At 9:44 p.m., Nicholas's mother texted back "What is going on anyway… Same old same old." Nicholas never responded. (GX 16-I, 921 at 78–79, 83).

as Nicholas was getting home, Nicholas's phone texted Jamie's phone: "Almost done folding [their youngest son's] clothes." (GX 16-H, 911-A, 921 at 89; Tr. 432, 442–43).

### 4. The Aftermath of the Murder, Including the Cover-Up

After the murder, the Orsinis engaged in a series of acts consistent with—and, in context and taken together, rather than separately, demonstrative of—covering up their crime. Among other things, they bought a new burner phone, drove three times to Amsterdam, New York, where Nicholas grew up, and where they could dispose of evidence, using only the burner phone when they did so, changed the number of the burner phone, bought equipment that could be used to burn evidence (and burned something), lied to the police, telling them (and their property manager) different stories about what happened the night of the murder and explaining why someone else might have wanted to kill Kraft, and, after having been questioned about the murder and seeing an attorney, visited one of the scenes of their crime: where they had dumped Kraft's car.

### a. The Orsinis Buy a New Burner Phone and Travel to and from Amsterdam, New York

Nicholas grew up in Amsterdam, New York—around 120 miles north of Beacon, where the Orsinis lived—on a 100-acre plot of land owned by his mother and other relatives. (GX 1004 ¶ 2). The Orsinis returned to Amsterdam the morning after the murder, making sure to bring a burner phone, and not their own phones, which they knew could be tracked.

At 8:03 a.m. on April 29, 2020–around 12 hours after killing Kraft—leaving their phones at home (GX 901 at 30), the Orsinis left their home in Beacon in their

GMC Envoy and drove toward the Newburgh Beacon Bridge, which would allow them to get to Walmart (GX 123-A, 210, 921 at 93–94, 1003).[11] At 8:57 a.m., the Orsinis purchased a new burner phone, with a phone number ending in 2891, at Walmart in Newburgh. (GX 704-D, 704-L, 921 at 96).[12] They then drove two hours north to Amsterdam—with their 2891 burner phone—where they remained for just a few hours before driving the two hours home so that Nicholas could go to work at 6:49 pm. (GX 111-A, 124, 125, 211, 244-A, 251, 258-A, 271, 274-A, 601, 602, 901 at 28–31, 921 at 98–110, 1003; Tr. 673–74).

On April 30, 2020, Nicholas searched for "How to view your location history in Google Maps." (GX 811-A, 913, 921 at 121; Tr. 793–94).

---

[11] When they later got to Amsterdam, it was clear that at least Jamie and Nicholas were in the GMC Envoy. Among other things, surveillance video showed both a driver and a passenger in the Orsinis' GMC Envoy at Wendy's in Amsterdam (GX 274-A, 921 at 102, 1003)—Nick drove, and wore the same orange sweatshirt that he wore to work that evening (GX 251, 258-A, 274-A, 921 at 102, 1003)—and they purchased multiple meals at Wendy's (GX 271, 921 at 103, 1003).

[12] There was no surveillance of the Orsinis' purchase of the 2891 burner phone. However, their later actions demonstrated that the 2891 burner phone was theirs. Among other things: the 2891 burner phone (including when its number was later changed) travelled with them to and from Amsterdam on three separate days, always consistent with video and license plate reader surveillance of the movement of their GMC Envoy (GX 111-A, 123-A, 125, 210, 211, 244-A, 263-A1, 274-A, 275-A, 276-A, 277, 601, 602, 603, 604, 605, 901 at 28, 34, 47, 1003); the 2891 burner phone was used to call Nicholas's mother (GX 704-E, 705-D, 705-F, 723-A, 911-A, 921 at 129, 921 at 170); Jamie used the 2891 burner phone to call her old friend, Bangaly Diomande, while she was at home with the 2891 burner phone and Nicholas was at work (GX 704-E, 901 at 36–37, 921 at 132; Tr. 345); the 2891 burner phone moved with Nicholas and his own personal phone to his workplace (GX 901 at 32); and Nicholas texted a link to his 2891 burner phone to allow him to install Raid: Shadow Legends on that phone (GX 16-F, 911-A, 921 at 111; Tr. 432, 440).

On May 1, 2020, again taking only the 2891 burner phone and leaving their own phones at home, the Orsinis drove all the way back up to Amsterdam, stayed a few hours, and drove all the way back home. (GX 275-A, 277, 603, 901 at 34–35, 921 at 126–29, 1003). Once the Orsinis came back, Jamie stayed at home while Nicholas went to work, and Jamie called her friend Bangaly Diomande using the 2891 burner phone. (GX 704-E, 901 at 36–37, 921 at 132; Tr. 345). Jamie—still at home in Beacon while Nicholas was at work (GX 901 at 36–37)—then called her cell-service provider and changed the number of the 2891 burner phone to a phone number ending in 4921 (GX 704-E, 705-D, 921 at 132; Tr. 750–52).

On May 9, 2020, the Orsinis once more went to Amsterdam—this time for slightly longer as they visited Nicholas's mother "briefly" for the first time during these day trips (GX 1004 ¶ 6)—once again, bringing their 2891/4921 burner phone, but leaving their own phones at home, and returning home the same day. (GX 263-A1, 264-A1, 273, 276-A, 604, 605, 901 at 47–48, 921 at 166–74, 1003).

### b.  The Orsinis Get Nervous and Burn Materials in their Backyard

The Orsinis showed concern that someone might figure out what was going on, so they bought equipment to create fires, burning evidence.

On May 2, 2020—the day after the Orsinis' second trip to Amsterdam—Nicholas started getting nervous that somebody might know about what they were doing. At 2:09 p.m., while still at home (GX 901 at 38), he texted his mother in Amsterdam: "Who did u tell I was coming up[?]" (GX 16-G, 911-A, 921 at 135; Tr. 432, 442). At around the same time, he searched for "orange county ny news" (Orange

County is where Newburgh, New York—where the Orsinis dumped Kraft's car—is located) and "montgomery county ny news" (Montgomery County is where Amsterdam, New York—where the Orsinis were driving to get rid of evidence—is located). (GX 811-P2, 913, 921 at 136; Tr. 794). A little over an hour later—at 3:32 p.m., as captured on video surveillance and their phones' geolocation data, the Orsinis pulled into the Home Depot parking lot in Fishkill, and Nicholas got out and went into the Home Depot. (GX 176-B1, 177-B1, 901 at 39, 921 at 137). At 3:54 p.m., Nicholas searched "is galvanized steel burn proof[?]" (GX 811-P3, 913, 921 at 138; Tr. 793–94). The Orsinis then drove home, returned to Home Depot, and bought equipment to make two large, controlled fires in which they could burn evidence: two 31-gallon galvanized steel trash cans, three bottles of lighter fluid, two metal grates, a lighter, four steel rods, an angle grinder with five metal grinding disks, and a hole saw. (GX 172, 178-B1, 179-B1, 180-B1, 181-B1, 901 at 40–41, 921 at 140–46, 1003).

The next morning, Nicholas returned to the Home Depot and bought 16 bundles of firewood. (GX 173, 182-B1, 183-B1, 184-B1, 185-B1, 901 at 42, 921 at 148–51, 1003).

Sure enough, the Orsinis burned something in their backyard; as one neighbor explained:

> There's one thing that I do remember experiencing. There was a day, it was a weekday, and I had wanted to open the windows because it was—I remember it being a really warm day and wanting to air out the apartment and so I had opened the windows, and then a very strong-smelling, like, foul-smelling smoke started come through the windows, and I got really upset that I had to close the windows. And the smell smelled just like nothing that I've

> experienced before, it—almost like a chemical or like a burning plastic or something, and I got upset because, A, I didn't want it in my apartment, but it also didn't seem like it was environmentally friendly and it was just really unpleasant, so I had to close the windows, and it had a lasting impression for me … It didn't smell like someone was burning firewood, it smelled like a substance that shouldn't be burned, like chemicals it. Kind of hurt your nose a little bit, like, it wasn't a natural-smelling burning smell … It did not smell like food, no. It didn't smell like anything I had ever smelled before ….

(Tr. 165–66). That smell lasted for approximately two days. (Tr. 166). Another neighbor explained that the fires caused "an acrid, awful smoke smell." (Tr 188). He "looked in the [Orsinis'] back[yard] and there were two large bins that were on—that were—some, something was burning in them and they were exuding very dark smoke." (Tr. 188). He saw Nicholas tending to the fires, and "poking it" with a steel rod. (Tr. 190). The fires were hot enough, and lasted long enough, that, when the police came to the Orsinis' home in Beacon months later, the ground was still burned. (GX 310-31).

### c.    The Orsini's Statements to the Police and Others

On occasion, the Orsinis talked about the night they killed Kraft. Their stories included provable lies, were often inconsistent, and attempted to establish that there were other people who likely killed Kraft.

On May 1, 2020, Nicholas told his Unilock supervisor that, on his "last missed day" (the evening of April 28), "it was because my wife had a job interview and the car broke down on her way back." (GX 259-A, 911-A, 921 at 125; Tr. 668–69). He said this in spite of the fact that both of the Orsinis' phones were at their home in Beacon

all night that night, and Nicholas drove Kraft's car into Newburgh, dumped it, and came back, using only the 2255 burner phone.

Jamie spoke repeatedly with the police, implicating people in Newburgh who might want to kill Kraft, such as: Kraft's ex-girlfriend (GX 510-GT); Kraft's ex-girlfriend's incarcerated ex-boyfriend (GX 510-GT, 510-LT); Kraft's coworker (GX 510-JT); and another girlfriend (GX 506-T). She also tried to direct the police to a drug-related motive, claiming she was concerned that Kraft used marijuana (GX 502-T), and that the police should look in the "drug area" of Newburgh because of Kraft's association with small amounts of marijuana (GX 502, 510-IT, 510-HT.) In one exchange, on May 6, 2020, and without prompting, Jamie changed the subject to affirmatively suggest that Kraft's car was found in Newburgh because it was a drug area and that Kraft likely was in the area to buy drugs:

> I guess he just, you know, said he was his friend or something. I don't really know how they even are in contact with each other, but I thought that was really strange that like, he found the car, you know?
>
> * * *
>
> Very strange. So, I don't know if maybe that's, I don't know if the car was found like a drug area or something. Maybe that's where they buy drugs.

(GX 510-HT). She then falsely claimed that Nicholas remained at home the entire night of the murder:

> MCNALLY:    And you said that, uh, the day that he dropped off on the 28th, your husband was here watching the children, right?
>
> ORSINI:    Yeah.

21

> MCNALLY:   And he stayed, did he stay with you the entire
>            night that night?
>
> ORSINI:    Yeah, he was home.

(GX 510-MT).

Jamie also told the police a variety of different stories about what happened that night. At one point, she explained that she and Kraft were outside together, in front of her home, for about an hour. (GX 510-KT). At another point, she told them that, while she and Kraft started talking outside, Kraft came into their home to talk about the girls. (GX 510-AT). But Jamie told the 10 West Church Street property manager that she never, ever let Kraft in, that she would only talk to him for a few minutes, and, on April 28, he just dropped his daughters off in front of the Orsinis' home and left. (GX 514).

### d.   The Orsinis Return to the One of the Scenes of the Crime

On May 6, 2020, the police interviewed Jamie at her home in Beacon. (Tr. 526; GX 510). The next day, on May 7, 2020, they returned to interview Nicholas; Jamie met them at the door and handed them a card with the name and address of the Orsinis' attorney in Poughkeepsie, New York. (Tr. 542).

Sure enough, that morning, the Orsinis had driven from their home in Beacon (on the east side of the Hudson River) to Poughkeepsie (also on the east side of the Hudson River), where they spent nearly two hours in the area of their attorney's office. (GX 901 at 43). However, when they finished, they did not go back to Beacon; at least, not immediately. (GX 901 at 44).

Rather, the Orsinis crossed the Hudson River and drove down Route 9W into Newburgh. (GX 901 at 44). Once in Newburgh, they drove within a block of where Nicholas had dumped Kraft's car. (GX 901 at 45). But they could see whether Kraft's car was still there:



*Figure 6 - GX 405-18*

(The white police car in the photo that is GX 405-18 is where Nicholas dumped Kraft's car (GX 300-1, 300-2; Tr. 65, 578, 583, 587, 888)). The Orsinis then drove home. (GX 901 at 46).

Nobody had ever told the Orsinis where Kraft's car was found.

## II.    Argument

### A.    There Was Sufficient Evidence of the Orsinis' Guilt

The Orsinis argue that there was insufficient evidence for a reasonable jury to convict them. (Jamie Br. 11–14; Nicholas Br. 6–10). Relatedly, as an alternative, Nicholas argues that, even if there was sufficient evidence for a reasonable jury to convicted him, he merits a new trial simply "because the evidence of Nicholas Orsini's guilt is remarkably unreliable." (Nicholas Br. 11). The Orsinis are wrong.

The Orsinis' arguments can be summarized as twofold: (1) There was no *direct evidence* of the charged crime, just circumstantial evidence requiring the jury to make inferences from the evidence (Jamie Br. 12–14; Nicholas Br. 7–8);[13] and (2) The defendants offered defenses at trial, namely alternative explanations for certain evidence (Jamie Br.12–14; Nicholas Br. 9). These arguments fail as a matter of both law and fact.

#### 1.    Applicable Law

##### a.    Rule 29 Standard

"[A] Rule 29 movant bears a heavy burden." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019). A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Ultimately, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

---

[13] There was direct evidence of the interstate-nexus element of carjacking. (GX 1007). The Orsinis do not appear to contest this element.

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Zhong*, 26 F.4th 536, 560 (2d Cir. 2022); *see also United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) ("A judgment of acquittal can be entered only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *Cuti*, 720 F.3d at 461). Thus, "[t]he task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not a reviewing court." *United States v. Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012); *see also United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) ("courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal[]"). The deference accorded to the jury's verdict "is especially important when reviewing a conviction of conspiracy … because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992). "The possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis …." *United States v. McPherson*, 424 F.3d 183, 190 (2d Cir. 2005).

Moreover, "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see*

*also United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not exclude every reasonable hypothesis other than that of guilt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

When conducing a sufficiency analysis, the court must consider "the evidence as a whole," *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002), and assess the evidence as "to the totality of the government's case and not to each element, as each fact may gain color from others" *Guadagna*, 183 F.3d at 130. "These standards apply whether the evidence being reviewed is direct or circumstantial." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011).

"[T]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *MacPherson*, 424 F.3d at 190. As a result, "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferecnes of culpability drawn from the circumstances are reasonable." *Id.*; *see also*, *e.g.*, *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015) ("A jury's verdict may be based entirely on circumstantial evidence.").

As this Court summarized: a sufficiency analysis "is an 'exceedingly deferential standard of review.'" *United States v. Reid*, No. 20 Cr. 626 (PMH), 2024 WL 2159848, at *2 (S.D.N.Y. May 14, 2024) (Halpern, *J.*) (quoting *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012))).

### b.    Rule 33 Standard

Given the deference owed to a jury's verdict, district courts must to exercise their Rule 33 authority—which permits them to "vacate any judgment and grant a

new trial if the interest of justice so requires," FED. R. CRIM. P. 33—"sparingly" and

only in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d

129, 134 (2d Cir. 2001)). The defendant bears the burden of proving that he is entitled

to a new trial under Rule 33 and, "before ordering a new trial pursuant to Rule 33, a

district court must find that there is a real concern that an innocent person may have

been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009); *see also*

*United States v. Lin Guang*, 511 F.3d 110, 119 (2d Cir. 2007) ("The test is whether it

would be a manifest injustice to let the guilty verdict stand." Accordingly, "the court

must examine the entire case, take into account all facts and circumstances, and

make an objective evaluation, keeping in mind that the ultimate test for such a

motion is whether letting a guilty verdict stand would be a manifest injustice." *United*

*States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).

### c.    Carjacking and Conspiracy

Count One of the Indictment charged the Orsinis with violating 18 U.S.C.

§§ 2119 and 2 by committing a carjacking resulted in the death, and aiding and

abetting that crime. Section 2119 provides in relevant part:

> Whoever, with the intent to cause death or serious bodily
> harm takes a motor vehicle that has been transported,
> shipped, or received in interstate or foreign commerce from
> the person or presence of another by force and violence or
> by intimidation, or attempts to do so [commits a crime].

There are four elements to a Section 2119 violation:

> *First*, that the defendant took a motor vehicle from the
> person or presence of another, or aided and abetted the
> same;

> *Second*, that the defendant took the vehicle by using force or violence or by acting in an intimidating manner, or aided and abetted the same;
>
> *Third*, that, at the precise moment that the defendant demanded or took control of the vehicle, he acted with intent to cause death or serious bodily harm, or aided and abetted the same; and
>
> *Fourth*, that the motor vehicle had previously been transported, shipped, or received in interstate or foreign commerce.

*See* Sand, *Modern Federal Jury Instructions*, Instr. 53A-2; *Holloway v. United States*, 526 U.S. 1, 8–11 (1999). This was how the Court instructed the jury. (Tr. 1356). Additionally, here, the jury found that death resulted from the Orsinis' conduct. For this, the Government had to prove that, but the actions of the defendant, or those he aided and abetted, the victim would not have died; however, the Government did not have to prove intent to kill or provide evidence that the victim's body had been found, or the manner in which he was killed. *See* Sand, *Modern Federal Jury Instructions*, Instr. 53A-8; *see also Persico*, 645 F.3d 85 at 105–06, 108–09. Again, this was how the Court instructed the jury. (Tr. 1362–63).

Additionally, Section 2 provides, in relevant part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

Count Two of the Indictment charges the Orsinis with violating 18 U.S.C. § 371 by participating in a conspiracy to commit a carjacking, in violation of 18 U.S.C. § 2119. Section 371 provides, in relevant part, that, "[i]f two or more persons conspire

… to commit any offense against the United States … and one or more of the persons

do any act to effect the object of the conspiracy," they commit a crime.[14]

### 2.    Discussion

As described in greater detail in Section I(A), above, there was ample—indeed,

overwhelming—evidence that Jamie and Nicholas murdered Kraft and took his car

as part of the cover-up. Among other things:

- Two days before the murder, Jamie and Nicholas drove to Home Depot in Fishkill, New York in their GMC Envoy. (GX 175-B1, 330-2, 1001, 1002, 1003). Jamie was captured on video purchasing 1,000 square feet of black plastic sheeting, a painter's coverall, disposable shoe guards, and duct tape (GX 171, 174-B1). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis were purchasing equipment to allow them to murder Kraft without leaving behind any forensic evidence.

- That same day, the Orsinis drove together—carrying their phones—on a circuitous "dry run" of the route that Nicholas would eventually take from Beacon to Newburgh after the murder. (GX 141-A, 142-A, 143-A, 144-A, 201, 901 at 12). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis were preparing to get rid of additional evidence by figuring out how to move Kraft's car from their home to a high-crime spot in Newburgh where the police would not connect the dumped car to the Orsinis.

- Hours later, the Orsinis again drove the same circuitous "dry run" of the route that Nicholas would eventually take from Beacon to Newburgh after the murder, although this time they left their phones at home, carrying only their daughter's phone, which they could track, including historically, using Life360. (GX 17-F,

---

[14] Although they do not spell it out, the Orsinis appear to rest their arguments regarding Count Two on their Count One arguments; accordingly, this memorandum will simply discuss the carjacking statute and evidence regarding that charge.

901 at 14–15; Tr. 695–96, 891–92). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis were again preparing to get rid of additional evidence by figuring out how to move Kraft's car from their home to a high-crime spot in Newburgh, but this time also figuring out whether the police would be able to track Nicholas's phone when he drove Kraft's car to Newburgh.

- The day before the murder, just after making a purchase at Sam's Club next door using Jamie's Sam's Club card, the Orsinis bought a "burner phone" from Walmart that Nicholas would use to call a taxi after dumping Kraft's car in Newburgh after the murder. (GX 221, 222-A, 223-A, 261, 261-A, 703-J, 1003). The jury could infer from this—in the context of the rest of the evidence—that, having learned from their second "dry run" the day before that a phone could be tracked on the planned route, the Orsinis decided to purchase a burner phone that they did not believe could be connected to them for the sole purpose of allowing Nicholas to get a taxi home after dumping Kraft's car.

- Kraft brought his daughters to the Orsinis' home in Beacon at approximately 7:00 pm on April 28, 2020. (GX 207, 901 at 21, 23, 1001). Kraft has not been heard from or seen since. (GX 1006 ¶ 8; Tr. 49, 58). Kraft's J10 phone went into the Orsinis' home, while the other stayed just outside in his car, where it was later found in the console. (GX 901 at 23). Nicholas's colleague repeatedly texted him, and, after initially not responding, he eventually provided conflicting (and false) stories. (GX 259-B). Jamie did not respond to her own daughter's texts. (GX 17-E). At 8:44 p.m., while both of the Orsinis' phones stayed at home, both of Kraft's phones drove, in Kraft's car, along the exact same circuitous route as the Orsinis had driven in their dry runs, to the entrance to Downing Park, where Kraft's car was dumped with the J3 phone still in the console. (GX 121, 145, 146-A, 208, 212, 921 at 52–53). The jury could infer from this—in the context of the rest of the evidence—that, as planned, the Orsinis murdered Kraft, simultaneously taking control of his car as part of the cover-up, and, again as planned, got rid of the car

by driving it to Newburgh, but leaving the J3 phone in the car because they did not know about it.

- Nicholas—walking alone—walked from the entrance of Downing Park to the Sunoco station, carrying Kraft's S10 phone—the phone he knew about—until he got rid of the S10 phone. (GX 152-A, 281, 901 at 25). When Nicholas got to the Sunoco station, he used the 2255 burner phone—for its only use—to call a taxi, and then threw the phone away, got into the taxi, and went back home. (GX 101, 126, 209, 241-A, 241-B, 241-C, 241-D, 241-E1, 242-A, 242-B, 242-C, 703-J, 901 at 25). The jury could infer from this—in the context of the rest of the evidence—that, as planned, Nicholas got rid of additional evidence that he knew about (the S10 phone), and went home, but did so in a way that he thought would make his movements untraceable: using a burner phone that he threw away, and covering his face and body.[15]

- Even though Nicholas was not at home, his phone was; Jamie sent innocuous texts to and from that phone. (GX 16-H, 16-I, 901 at 27). The jury could infer from this—in the context of the rest of the evidence—that Jamie was trying to create an "alibi" for her husband, so she could say that he was at home all night.

- The next day, the Orsinis purchased a new burner phone, which they used to drive to and from Amsterdam three times—each a day trip in which they drove more time than they were actually in Amsterdam—during which trips they did not bring their own phones. (GX 57, 111-A, 124, 211, 244-A, 274-A, 601, 602, 704-D, 704-E, 704-L, 901 at 28–31, 34–35, 47–48). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis were traveling to Amsterdam to get rid of evidence of their crime, and again ensuring that the police could not track them as they did so by leaving

---

[15] That was not all. The Orsinis were clearly aware of the possibility of leaving behind forensic evidence—that was why they purchased the tarp, tape, full-body suit, and booties—and Nicholas's outfit in which he left no skin or hair exposed, ensured that he would not leave forensic evidence in Kraft's car.

their own phones at home and bringing only their burner phone.

- A few days after the murder, Nicholas searched "orange county ny news" and "montgomery county ny news," which are the counties in which Beacon and Amsterdam are located, respectively, and asked his mother if she had told anybody that he was coming up to Amsterdam. (GX 16-G, 811-P2). The jury could infer from this—in the context of the rest of the evidence—that Nicholas was nervous about someone finding out that he was dumping evidence from his murder/carjacking—Kraft's car in Orange County and whatever they were dumping in Amsterdam in Montgomery County—and wanted to figure out if his fears were well-founded.

- Nicholas searched "is galvanized steel fireproof?" and the Orsinis bought tools suitable to destroy evidence, including two 31-gallon galvanized steel round trash cans, a coarse stainless-steel rod, an angle grinder with grinding wheel, five metal disks, three 32-ounce bottles of odorless charcoal lighter fluid, two charcoal grates, an axe, and a flame lighter. (GX 172, 178-B1, 179-B1, 180-B1, 181-B1, 901 at 40–41). The following morning, Nicholas returned and purchased 16 bundles of firewood. (GX 173, 182-B1, 183-B1, 184-B1, 185-B1, 901 at 42). The Orsinis then turned the trash cans into incinerators, burning items that let off an "acrid, awful" and "foul" odor. (Tr. 165–66, 188–90). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis decided to burn some of the evidence of their crime—again, the theme of much of the evidence was that they were aware of the dangers of leaving forensic evidence—and did so successfully.

- The Orsinis lied to the police and others about what had happened—some of those lies provable based on direct evidence—and Jamie provided the police with a series of potential suspects (one of whom was incarcerated, unbeknownst to her). (*See* Section I(A)(4)(c), above). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis were attempting to throw the police off their scent and, indeed, that this was part of their plan all along: place Kraft's car in a

32

high-crime neighborhood so that the police would think that someone in Newburgh killed Kraft.

- After Jamie met with the police at her home, she and Nicholas went to meet with an attorney in Poughkeepsie. (GX 510, 901 at 43). But afterward, they drove directly to Newburgh, where they drove by where Nicholas had dumped Kraft's car, even though nobody had told the Orsinis where the car was. (GX 405-18, 901 at 44–45). The jury could infer from this—in the context of the rest of the evidence—that the Orsinis wanted to see if Kraft's car was still where they left it, or if the police had moved it. And they knew where to find it because they had put it there in the first place.

In short, there was overwhelming evidence of the Orsinis' guilt. It may have been mostly circumstantial—which is the heart of the Orsinis' argument—but that is of no moment, as the "jury's verdict may be based entirely on circumstantial evidence." *Rutigliano*, 790 F.3d at 402.

The Orsinis' arguments in response fail factually. As discussed above, the evidence was not just sufficient, it was overwhelming. The Orsinis raise a number of "alternative" explanations for individual pieces of evidence. Each concern can be dismissed for three separate, independently sufficient reasons: (1) they raised these alternatives before the jury, and the jury had a right to reject them, *see*, *e.g.*, *United States v. Campos*, 763 F. App'x 97, 99 (2d Cir. 2019) (The jury rejected his testimony as well as his defense of good faith; and he has shown no basis to question the jury's findings."); (2) even if their alternatives were credible—and they are not—they are not credible in the context of the evidence of the entire case, *see*, *e.g.*, *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir. 1991) ("in considering [sufficiency] claims, we examine the evidence adduced at trial in its entirety …"); and (3) and they demand

that the Court credit all inferences—reasonable or unreasonable—in favor of the

defense, *see id.* "in considering [sufficiency] claims, we … credit all reasonable

inferences that can be drawn in favor of the prosecution." But that is not all; a brief

examination of the Orsinis' "alternatives" causes them to fall apart. For example:

- "[I]t was an equally supportable inference that Kraft chose to disappear, as he had done at least once before, either before or after he and Nicholas Orsini travelled to Newburgh to purchase drugs." (Jamie Br. 12; *see also* Nicholas Br. 9). Except that Kraft previously disappeared *with Jamie*, and believed that he was going to get more time with his daughters. (GX 1006 ¶¶ 3–4, 7). Moreover: only one person—Nicholas—walked from Kraft's car to the Sunoco station;[16] if Kraft had driven with Nicholas, there is no reason he would leave his car,

---

[16] Nicholas focuses on the fact that an officer, on cross-examination, said, looking at a reflection in the window of Kraft's car, that "there is something in the passenger seat." (Nicholas Br. 7 (quoting Tr. 633)). But this Court and the jury saw the exhibit the officer reviewed (DX Y), and could see that there was no person in the passenger seat; moreover, the jury was entitled to accept or discard this testimony as it saw fit:



that he would forget that he had a phone in the console and walk away from it, or that he would give Nicholas his phone to throw out; Nicholas had planned not to be caught, buying a burner phone just to get home; Jamie was creating alibis for Nicholas; and this does not fit with the evidence of the planning or the cover-up.

- "If Kraft was killed elsewhere, perhaps after parking his Camry in Newburgh, that would support the conclusion that Jamie Orsini was not involved because the location evidence established that she was inside or in the vicinity of the Orsini residence after 7 p.m. on April 28, 2020." (Jamie Br. 13). There was no evidence that Kraft was "killed elsewhere, perhaps after parking his Camry in Newburgh." Indeed, if he were, as opposed to being killed in the controlled environment of the Orsinis' home, one would expect to find forensic evidence or a body. And he would have taken his phone from the console of his car. Moreover, this is inconsistent with the evidence of the Orsinis' planning of the murder, or the conflicting stories provided after the murder. Again, the jury was allowed to infer that the Orsinis murdered Kraft in their home.

- "Nicholas Orsini's use of drugs, coupled with evidence that Third and Carpenter is a location to buy drugs, support an equally plausible inference that Nicholas Orsini drove there to purchase drugs. At most, Jamie Orsini was simply a passenger in the car and there is no evidence that she directed Nicholas Orsini to drive to that location, that she knew he was going to drive there, or that she knew it was a 'dry run.'" There is nothing "equally plausible" about this inference. The Orsinis did not stop when they drove to the area of Third and Carpenter, which one would have to do to buy drugs. Nor did they stop on the second dry run, when they left Jamie's and Nicholas's phones at home and took their daughter's phone to track it. And this would not account for Jamie's purchase of murder supplies, Jamie's participation in buying and activating the first burner phone, Jamie's participation in buying and activating the second burner phone, Jamie's decision to change the phone number of the second burner phone, Jamie's participation in buying the incineration equipment, Jamie's fluctuating stories, or Jamie's

participation in driving back to where they dumped Kraft's car.

- "There was no evidence of whether or when Kraft may have been harmed during that period, whether or when he had put his keys down, or whether or when his keys or vehicle were forcibly taken from him." (Jamie Br. 14). This is essentially saying that the jury was required to infer that, despite planning a murder that involved taking Kraft's car, the Orsinis instead waited for Kraft to take his keys out of his pocket, took those keys, and hid them before murdering Kraft, knowing that their plans were all for naught if he did not happen to do so, because, while they were prepared for (and did) murder Kraft, they did not want to take his keys while they did so. Given the planning and preparation involved in this murder and cover-up, this inference is not realistic and, in any event, is not one that the jury was required to make.

In short, a rational trier of fact could have—and did—find the essential elements of carjacking, based in large part on circumstantial evidence, and this Court should deny the Orsinis' Rule 29 motion. For the same reasons, there is no "real concern that an innocent person may have been convicted," *McCourty*, 562 F.3d at 475, and this Court should deny the Orsinis' evidence-based Rule 33 motion.

## B. There Is No Basis to Grant a New Trial

Jamie also argues that she should be granted a new trial for three reasons: (1) the Court improperly admitted the evidence of what the Orsinis purchased at Home Depot and Walmart (Jamie Br. 15–17); (2) the Court erred in declining to give the Orsinis' requested jury instruction (Jamie Br. 17–21); and (3) Section 2119 is unconstitutionally vague as applied (Jamie Br. 21–24). Each argument can be swiftly rejected; indeed, the first two arguments appear to be made for the purpose of preserving arguments for appeal and can be rejected because, "when a court has ruled

on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009). "A court's reconsideration of its own earlier decision in a case" is justified only "in compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id.*

### 1.    This Court Properly Admitted Evidence of the Orsinis' Preparation for, and Cover-Up, of Their Crimes

As Jamie forthrightly admits (Jamie Br. 15), the Orsinis moved *in limine* to preclude the admission of evidence of their purchases at the Home Depot, both before the murder (the tarp, full-body suit, booties, and tape) and after (the items used to make the incinerators). (Docket Entry 85 at 5–7). The Court deferred, telling the Orsinis that, "to the extent you have relevancy objections at the appropriate time concerning the appropriate witness or exhibit, you'll raise them with me and I'll rule on them." (Final Pretrial Conference Tr. 12). At trial, the Court overruled the Orsinis' objections with respect to the exhibits. (Tr. 122–24).[17] While it is unclear whether evidentiary rulings such as these constitute "law of the case," *see United States v. Angelo*, 87 F. App'x 205, 207 (2d Cir. 2004), such that this Court would be legally bound by them, Jamie has offered this Court no new arguments to explain why it got its evidentiary ruling wrong.

---

[17] While Jamie says that this Court admitted the neighbors' testimony about the incinerators "[o]ver objection" (Jamie Br. 16), the Orsinis did not, in fact, object to their of their testimony at trial, as this Court had instructed them to do if they wanted to preserve their objections. (Tr. 145–75, 182–98).

To the contrary, Jamie simply rehashes her trial arguments: that the evidence was not incriminatory on its face. (Jamie Br. 15 (referring to "various standard household items")). But that is not the standard. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Otherwise admissible evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403. The term "'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged," or in other words "an undue tendency to suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) (the "prejudice that Rule 403 is concerned with involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence"). Thus, when the evidence does not "involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged, it will not be barred by Rule 403. *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019).

Here, Jamie fails to identify any unfair prejudice; to the contrary, she argues that the evidence should have been precluded because it was probative: it tended to show that the Orsinis planned to and did, in fact, cover up the murder (Jamie Br. 16–17), that is, that the evidence "tend[ed] to prove the fact or issue that justified its

38

admission into evidence." *Kuthuru*, 665 F. App'x at 38. Jamie's argument that there were alternative explanations for the evidence—explanations that they provided at trial and that the jury rejected—goes to the weight of the evidence, not its admissibility. Simply put, a key part of the Orsinis' crimes was the cover-up—indeed the planning of the cover-up tended to prove the elements of the carjacking—and the Government was entitled to put on its case.[18] Conversely, a key part of the Orsinis' defense at trial was questioning the lack of forensic evidence of the murder; the Government was entitled to put on evidence that they obtained and used tools to prevent the collection of or destroy evidence. The fact that the jury had to make inferences to understand the relevance of that evidence is of no moment, as the "jury's verdict may be based entirely on circumstantial evidence." *Rutigliano*, 790 F.3d at 402.

Accordingly, this Court was correct to admit the challenged evidence, and the Orsinis provide no basis to think otherwise.

### 2.    This Court Instructed the Jury Properly

In advance of trial, the parties debated the applicable law regarding Section 2119. (Docket Entry 77 at 17–18, 20–21). The Orsinis based their arguments on a strained reading of two out-of-Circuit cases: *United States v. Applewhaite*, 195

---

[18] This raises another issue: "what counts as the Rule 403 "probative value" of an item of evidence, as distinct from its Rule 401 "relevance," may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). While this sort of comparison is rarely helpful, as "the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story," *id.* at 190, here, Jamie has offered no evidentiary alternatives. She instead just asks that the Government not have been allowed to prove its case.

F.3d 679 (3d Cir. 1999); and *United States v. Harris*, 420 F.3d 467 (5th Cir. 2005).
(Docket Entry 77 at 18; Docket Entry 85 at 8–13). The Government responded at
length. (Docket Entry 79 at 38–51). This Court reviewed the applicable law (Final
Pretrial Conference Tr. 9–11), and held that, "in accordance with *Holloway* and
*Felder*, the intent to kill for any reason coupled with the taking of the car by use of
force or violence is sufficient …. The unconditional intent theory is viable as a matter
of law" (*Id.* 11). Accordingly, the Court announced that it "will charge the jury on the
government's theory of unconditional intent if the government adduces proof on this
theory." (*Id.* 11). At the charge conference, the Court reaffirmed its ruling. (Tr. 1185
("As I ruled at the final pretrial conference, I'll be using the government's proposed
language for proposed instructions 8, 10 and 11. I do find the government has adduced
proof with respect to the unconditional theory of intent.")).

This Court's ruling on what the law of carjacking is constitutes the law of the
case. Accordingly, that decision should generally be adhered to by that court in
subsequent stages in the same case." *Carr*, 557 F.3d at 102. The Court should only
reconsider that decision "in compelling circumstances, consisting principally of (1) an
intervening change in controlling law, (2) new evidence, or (3) the need to correct a
clear error of law or to prevent manifest injustice." *Id.*

Here, Jamie has offered no claim of intervening change in controlling law, new
evidence, or "clear error of law or to prevent manifest injustice." Rather, she simply
says, as she has before, that this Court's jury instruction was wrong. (Jamie Br. 17–
21). That is not enough to overcome the law-of-the-case doctrine.

Even if it were, however, Jamie has another problem: she offers to reason to believe that the Court got the law wrong. Jamie made precisely the same arguments before, the Court reviewed the case law, and instructed the jury consistent with Supreme Court and Second Circuit law. For the reasons the Government provided in its initial briefing (Docket Entry 79 at 38–51), and that this Court provided at the final pretrial conference, Jamie is mistaken: the jury charge as given accurately explained the law to the jurors.

### C.    Section 2119 Is Not Unconstitutionally Vague

Jamie argues that Section 2119 is unconstitutionally vague as applied to her.[19] (Jamie Br. 21–24). Her argument is that the Supreme Court discussed certain carjacking scenarios in a case, and "[t]he Orsini case bears no resemblance to the scenarios analyzed … because, absent pure conjecture, there is no basis to conclude that a robbery or carjacking occurred." (Jamie Br. 23).[20] But this is not how a vagueness analysis works. Jamie's argument is meritless.

---

[19] While, through most of her argument, she asserts merely that the statute is "unconstitutionally vague," implying that she is making a facial challenge (Jamie Br. 21–23), at the end she states that, "[a]s applied in the Orsini case, the carjacking is unconstitutionally vague" (Jamie Br. 24).

[20] There is a problem with the argument: Jamie veers off into a sufficiency argument (Jamie Br. 23 ("there is no evidence of when or how Kraft might have become separated from his car or car keys")), as well as an argument that the jury instructions were erroneous (id. ("[t]he Court's denial of Jamie Orsini's requests to charge … can only be considered arbitrary, given the lack of case law supporting the theory advanced by the government.")). These issues are addressed above.

### 1.    Applicable Law

"[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling v. United States*, 561 U.S. 358, 412 (2010). To determine whether a statute is unconstitutionally vague, the Supreme Court has established a two-part test that "requires that a penal statute define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Outside of the First Amendment context, a vagueness challenge is assessed "only as applied, *i.e.*, in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (en banc).

In the context of an as-applied vagueness challenge, "one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadirashvili*, 655 F.3d 114, 122 (2d Cir. 2011); *see also United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020). Importantly, "[i]n an as-applied vagueness challenge, the inquiry begins with the text of the statute, … and asks whether the statute's language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding. … We therefore consult the statutory text." *United States v. Houtar*, 980 F.3d 268, 275 (2d Cir. 2020). "Because our vagueness inquiry depends primarily on the text of the challenged statute … caselaw scenarios are of limited relevance." *Id.* at 276.

A statute will survive an "as applied" vagueness challenge so long as it "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo*, 332 U.S. 1, 8 (1947); *Posters 'N' Things, Ltd. v. United States.*, 511 U.S. 513, 525–26 (1994). This concern about notice "is ameliorated" if the statute "contains a scienter requirement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004) ("[b]ecause the statute at issue here contains a scienter requirement … the defendants' vagueness challenge must be met with some measure of skepticism, at least with regard to the 'fair notice' prong of *Kolender*"); *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) (rejecting challenge to 18 U.S.C. § 1512(b), which makes it a crime to "corruptly persuade" another person … with intent to … influence, delay, or prevent the testimony of any person in an official proceeding"); *United States v. Strauss*, 999 F.2d 692, 698 (2d Cir. 1993) (rejecting challenge to federal statutes making it a felony to mislabel dog food "with the intent to defraud or mislead"). There are no magic words that establish scienter sufficient to ensure that a statute is not vague; rather, if the statute and jury instructions explicitly require the jury to find criminal *mens rea* to establish guilt, the statute can survive a vagueness challenge. *See*, *e.g.*, *United States v. Curcio*, 712 F.2d 1532, 1543–44 (2d Cir. 1983) (Friendly, *J.*).

43

### 2.    Discussion

Jamie—citing only one case for the generic rule that laws must be clear (Jamie Br. 22 (citing *Beckles v. United States*, 580 U.S. 256 (2017)))[21]—argues that Section 2119—the carjacking statute—is unconstitutionally vague as applied to Jamie because her crime did not resemble what is, in Jamie's mind, "a classic carjacking or a robbery involving theft of a car or car keys." (Jamie Br. 23). This analysis is unpersuasive.

First, Section 2119 is a specific intent crime and sets forth, in plain language, a *mens rea* requirement: it is not violated unless, among other things, a defendant must have "acted *with intent* to cause death or serious bodily harm." Sand, *Modern Federal Jury Instructions*, Instr. 53A-2;[22] *Holloway*, 526 U.S. at 8–11; 18 U.S.C. § 2119 ("Whoever, *with the intent* to cause death or serious bodily harm takes a motor vehicle … from the person or presence of another by force and violence or by intimidation, or attempts to do so [commits a crime]." (emphasis added)). Accordingly, courts have repeatedly held that Section 2119 is a specific intent crime. *See, e.g.*, *Holloway*, 526 U.S. at 11 ("an empty threat … is not enough to satisfy § 2119's specific intent element"); *United States v. Felder*, 993 F.3d 57, 70 (2d Cir. 2021) ("a defendant can only be guilty of carjacking resulting in death if, at the moment he forcibly takes

[21] *Beckles* is an odd case to cite, as it stands for the proposition that the United States Sentencing Guidelines are not subject to a due process void-for-vagueness challenge. 580 U.S. at 270.

[22] Other elements of the crime—such as using force or violence or intimidation—imply specific intent; however, in light of the explicit specific intent requirement, this Court need not reach those elements.

or attempts forcibly to take a vehicle, he possesses a specific intent 'to cause death or serious bodily harm.'"). By its plain terms, the statute requires that the jury find, beyond a reasonable doubt, that a defendant acted with the intent to cause death or serious bodily harm. This is enough to establish that the statute is not vague, even as applied. *See United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997) ("The sufficiency of the evidence to satisfy the scienter requirement in a particular case is a threshold issue that obviates a vagueness challenge."); *see also*, *e.g.*, *Copeland v. Vance*, 893 F.3d 101, 121 (2d Cir. 2018) (explaining that a "scienter requirement may mitigate a law's vagueness, especially when the defendant alleges inadequate notice."); *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) ("§ 1519's scienter requirement alleviates any lingering concerns about fair notice," defeating a vagueness challenge).[23]

Second, in any event, vagueness analysis is not done by determining what a specific defendant thought felt like a "classic carjacking"; rather, "the inquiry begins with the text of the statute, … and asks whether the statute's language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding." *Houtar*, 980 F.3d at 275. Here, the text of the statute is clear: "Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle … from the person or presence of another by force and violence or by intimidation, or attempts to do so" commits a crime. 18 U.S.C. § 2119. Using the text of the statute,

---

[23] Indeed, the facts of this case bear out that the Orsinis understood their actions to be unlawful; the jury heard extensive evidence of their plans to cover up their crimes, and the actions they took to effectuate those plans.

the jury found that the Orsinis: (1) acted with the intent to cause death or serious bodily harm; (2) took a motor vehicle from the person or presence of another; and (3) did so by force and violence or by intimidation. (Tr. 1362–63 (jury instructions)). The question is not whether Jamie believed this felt like what she thought a carjacking should be; rather, the statute is not vague because the text of the statute is clear: Jamie was on notice that she could not take a motor vehicle from another by force and violence or intimidation while acting with the intent to cause death or serious bodily injury. *See Scott*, 979 F.3d at 993 ("As a result, one whose conduct is 'clearly proscribed' by a statute cannot challenge it as void for vagueness."). It is therefore not surprising that other courts have determined that Section 2119 is not unconstitutionally vague. *See*, *e.g.*, *United States v. Edwards*, 231 F.3d 933, 935 (5th Cir. 2000) (rejecting vagueness challenge to Section 2119); *United States v. Williams*, 51 F.3d 1004, 1009 (11th Cir. 1995) (holding that Section 2119 is not void for vagueness because it is not defined in a manner that encourages arbitrary and discriminatory enforcement); *United States v. Watson*, 815 F. Supp. 827, 836 (E.D. Penn. 1993) ("Section 2119 satisfies both of the vagueness concerns because it contains no ambiguities."); *cf. Ewing v. United States*, Nos. 21 Civ. 9750 (VB), 14 Cr. 604 (VB), 2022 WL 17417290, at *4 (S.D.N.Y. Dec. 5, 2022) (Briccetti, *J.*) ("In addition, neither of the two statutes under which Ewing was convicted—18 U.S.C. § 2119 (carjacking resulting in death) and 18 U.S.C. § 1791 (providing contraband to other inmates in prison)—has been found to be unconstitutionally vague.").

Finally, Jamie tries to get around the required vagueness analysis by arguing that *Holloway* discussed certain examples of carjacking and, because Jamie's crime did not factually resemble those examples, the statute must be vague as applied to Jamie. (Jamie Br. 23). She cites no case law for this extraordinary proposition—that a court's recitation of illustrative cases necessarily narrows the potential applicability of a clearly worded statute to facts directly analogous to those cases—nor can she, as a vagueness challenge looks to the text of the statute, and, if that is clear, no further. *See, e.g., Nadirashvili*, 655 F.3d at 122 ("one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.").[24] This is why the Second Circuit has told courts, in no uncertain terms, that "[b]ecause our vagueness inquiry depends primarily on the text of the challenged statute … caselaw scenarios are of limited relevance." *Houtar*, 980 F.3d at 276.

Here, Jamie knew what she was doing was unlawful. She knew it because the statute's own words clearly reach her conduct, and she knew it because Section 2119 is a specific intent crime. Her vagueness challenge fails.

---

[24] For this reason as well, Jamie's attempts to graft additional elements onto the statutory requirements—namely, that the defendant's use of force or violence, and intent to cause death or serious bodily injury, were done in furtherance of the taking of the car (Jamie Br. 18)—that are not found anywhere in the text of the statute do not factor into a vagueness challenge.

### III.    Conclusion

This Court should deny the Orsinis' post-trial motions.

Dated:  White Plains, New York
       March 21, 2025

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By: _____
Kaiya Arroyo
Michael D. Maimin
Kathryn P. Wheelock
Assistant United States Attorneys

48