ANDERSON KILL P.C.

Attorneys and Counselors at Law

7 TIMES SQUARE, 15TH FLOOR ■ NEW YORK, NY 10036
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.AndersonKill.com

Samuel M. Braverman, Esq.
SBraverman@AndersonKill.com
Direct Tel. 212-278-1008

August 4, 2026

Re: *United States v. Jamie Orsini*
Dkt. 23 Cr 402 (PMH)

Hon. Philip M. Halpern
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Dear Judge Halpern:

I am counsel for Jamie Orsini and I write in reply to the Government's submissions in advance of sentencing. Many of the Government's arguments run contrary into facts in the record, and the inferences they draw are unsustainable. It is true and unrebuttable that the jury convicted Jamie Orsini of Conspiracy to Commit Carjacking and the substantive crime of Carjacking. But the Government goes too far when it inserts its own reasons, speculations, and insinuations into the narrative to fill the remaining holes in its prosecution.

As an overview, the Government's faulty arguments fall into three categories:

1) Pure insinuation of motive, knowledge, and purpose where a physical or temporal fact may be provable but there is no objective fact that provides the concurrent mindset. Here the Government uses television-style scriptwriting to weave a story to fill in holes in its evidence, and to make more salacious the charged crime.

2) Completely ignore contrary facts that don't fit into the Government's narrative. The denial of objective and provable facts, often collected by law enforcement (including the case agent in this case), undermines the objectivity of the Government's arguments here.

3) Completely ignore this history of abuse of all forms that has plagued Jamie Orsini throughout her life, and the concrete, significant, and direct influences that abuse has had on her, in the offense itself, and to this Court in its understanding of the history and characteristics of the defendant who stands before it for sentencing.

The Government's Flair For the Dramatic Instead of the Evidence.

From the first page of the Government's sentencing memo, it argues that this was "not a crime of passion", takes "a father from Kraft's daughters", and that "law enforcement still has not found Kraft's body". Each of these simple statements, so attractive in their offering, do nothing.

Although motive is not required as an element of a crime, it is foundational in our desire to understand *why* crimes are committed so that we can better understand what to do once they have been committed (both for sentencing and for prevention.) If there ever was a motive for this crime, it was that Nicholas Orsini believed that Steven Kraft was abusing his daughters. Yet the Government denies any evidence that supports this motive, offers no other motive, and merely repeats that this was "a cold-blooded, calculated, lying-in-wait murder that the Orsini's prepared for extensively, executed perfectly and worked tirelessly to cover up."

Nicholas Orsini writes for three pages in his letter to the Court about his motive for committing the murder. He never mentions money, greed, sociopathy, lack of empathy, cruelty, hatred, or anything else vaguely resembling a motive *other than* believing that Steven Kraft had and was sexually abusing the two daughters Kraft shared with Jamie, and over which Nicholas Orsini shared childcare.[1] Nicholas Orsini's sentencing memo addresses this issue again, in pursuing the loss of reason argument, but the Government ignores this and yet has nothing to put in its place that matches the facts of the case. If Nicholas Orsini killed Steven Kraft for a reason other than to stop abuse, what was it? The Government would have this Court believe that Jamie Orsini is a Svengali, or a witch, capable of mystifying others into doing her will. And yet, there is no other example of that in Jamie Orsini's 40 other years of life. She worked at minor jobs, made minor wages, had few assets, lost her children to the foster system and other caretakers, lived in a car, was repeatedly abused and assaulted, suffered permanent injuries and chronic emotional trauma, and watched her children suffer under the same hands of those who abused her. There is nothing that fixes the Government's motive problem. The correct answer rests in the defense submission.

---

[1] Notably, Nicholas's Orsini's letter never mentioned how the killing of Steven Kraft had anything to do with the obtaining or taking of Steven Kraft's vehicle, a *sine qua non* of 18 USC §2119 Carjacking, which the Government elides over without a notice. The Government in its sentencing memo gladly points out that Mr. Orsini has at least implicitly admitted participation in the murder of Mr. Kraft, but ignores that Mr. Orsini omits any fact which would support the taking of the car in any related to the clearly state crime of homicide. That too fails to fit its narrative that this was a federal Carjacking and not a state homicide matter.

Jamie Orsini submitted more than 50 pages of expert report, plus hundreds of pages of supporting documentation, to show that she has lived a life of sustained abuse. The Government waives its pen and says that there is nothing to corroborate such claims, because to acknowledge the claims would be to admit the motive the Government doesn't want to admit, and to de-beatify the victim of the crime that it seeks to bolster. When the Government isn't outright denying the existence of the abuse Jamie Orsini suffered from the deceased and her co-defendant, it claims that it has no bearing on the 18 USC §3553(a) factors that this Court is directed to review and consider in crafting the appropriate sentence in this case. Jamie Orsini submits that this Court must hear from Dr. Lenore Walker directly at sentencing to understand better *why* 30+ years of domestic violence has an enormous impact on a person's judgment, decision making, ability to discern outcomes, ability to resist abusers and their demands, and to submit to authority.[2] The Government doesn't even acknowledge that the reason Nicholas Orsini is in Criminal History Category II is for his domestic violence *against Jamie Orsini in the weeks leading up to their arrest.*

<u>The Government's Blind Eye to Objective Facts that Don't Fit Its Dramatic Narrative.</u>

The "contrary facts" problem for the Government is a separate, but equally destabilizing influence on its arguments.

As an initial matter, Jamie Orsini has not advanced, overtly or by implication, the "Kraft needed killing and I had standing to do it" argument. (See Government sentencing memo beginning at p.2, and the repeated citation to *United States v. James*, 169 F.3d 1210 (9th Cir. 1999)) The Government uses this straw man argument repeatedly to reject Jamie Orsini's history of abuse, notwithstanding that the argument and her history are wholly unrelated. Jamie Orsini's offer of her history to the Court claims no justification for Nicholas Orsini killing Steven Kraft. That defense was not offered at trial, to probation, nor is it offered now.[3]

---

[2] Dr. Walker can appear and testify before this Court remotely from her home in Florida on August 11, 2026 so as to keep the sentencing date previous scheduled.

[3] The Government next immediate argument after this straw-man argument is that only Murder and Treason are death penalty eligible offenses. On this issue, the Government is already tardy. *See* Scurich, Nicholas, et al., *Public Opinion and the Eighth Amendment: Is There a National Consensus on the Death Penalty for Child Rape?*, June 23, 2026 (See attached). This recent study identified five states that have passed legislation allowing for the death penalty to be imposed in cases of child sexual abuse not resulting in death (Florida, Tennessee, Idaho, Oklahoma, and Alabama, (and Florida has already imposed one death sentence under its law.)) Arkansas, Kentucky, Mississippi, Missouri, South Carolina and South Dakota have all also introduced such legislation. In signing Florida's legislation, Gov. Ronald DeSantis stated "This bill sets up a procedure to be able to challenge that precedent [*Kennedy v. Louisiana*] and to be able to say that in

For example, the Government doesn't even acknowledge seven law enforcement reports, all of investigations or interviews about Steven Kraft, which directly offer examples of his domestic violence and potential sexual interest in his daughters. (See Attached "Documents Contradicting Steven Kraft's 'Simple' or 'Sweet' or 'Non-Violent' Disposition). They include the following:

1. Supporting Deposition of Bernadette Babcock, dated 5/11/20, wherein she described Steven Kraft being beaten by a "baby mamma's boyfriend" (not described to be related to Jamie Orsini);

2. Interview of Tiffany Bracy, dated 5/6/20, wherein she told New York State Police Investigators that Kraft stalked her, harassed her, physically abused her over the course of a few years of their relationship, and that he was "Abusive, manipulative and his personality switched on and off." She continued that she was informed that Kraft physically abused another woman that he was romantically involved with, Sylvia Cooper, including by strangulation.

3. Interview of Sylvia Cooper, dated 5/12/20, wherein she confirmed to New York State Police Investigators that Kraft and her had a romantic relationship that ended because of domestic abuse.

4. Note to file by NYSP Inv. Merla, the case agent in the instant matter, date 5/6/20, wherein he noted that he spoke with Nichole Cricchio who stated that Kraft and his prior romantic partner Tiffany Gonzalez do not get along.

5. Immediately following up on that report by Ms. Cricchio, NYSP Inv. Merla took a sworn statement of Ms. Cricchio, dated 5/6/20, wherein Ms. Cricchio swore to her that Kraft had told her that Ms. Gonzalez had tried to get someone to kill Steven Kraft.

6. Interview of Nilsa Gonzalez, dated 8/30/21, by NYSP investigators working this case, wherein Mrs. Gonzalez stated that her granddaughter by Steven Kraft and Mrs. Gonzalez's daughter had been injured in Kraft's care, that there was domestic violence in that relationship as well. Most relevant to this issue, the Government completely ignores the following statement in its entirety: "Mrs. Gonzalez stated that Katalyna had told her once that her father (Stephen) would let her and her sisters to play outside while (Stephen) would take one of his girls (the nonverbal daughter) back inside alone. Mrs. Gonzalez also stated

---

Florida we think that the worst of the worst crimes deserve the worst of the worst punishment." Such legislation may find a welcome home on the current Supreme Court where none of the *Kennedy* majority remain on the court, but three of the jurists in the *Kennedy* dissent (Thomas, Roberts, and Alito) still sit, along with three other new conservative justices.

that Katalyna once told her that her father would ask her to keep something quiet by asking her to keep it as quote our little secret."

7. Interview of Caitlin Kennedy, dated 5/12/20, by NYSP investigators working this case, wherein Ms. Kennedy stated that she was nervous about his disappearance stating that she "Feels that Kraft would run his mouth to the wrong person. Kennedy has never personally seen him in any altercations or known him to be aggressive, but she states that she heard him say things that let her do believe that he would run his mouth. When asked what she was referring to, she stated that he would say things like 'that stupid bitch' and go off about his ex-wife."

These objective facts are not offered to support the Government's claimed "he needed killing" argument. They are offered because the Government *ignores* any fact which contradicts its narrative (even those collected by their own investigators.) Particularly where the Government rejects any possibility that Mr. Kraft was abusive to his daughters (See Government Sentencing Memo, pp. 5-8), the passing line "Kraft openly admitted that, years earlier, when his older daughter was an infant, he had a graphic dream about her. (Government Exhibit B at 2)." This dream was about having his infant daughter perform fellatio on him. Given the statements of Nilsa Gonzalez (*supra*) about Mr. Kraft requiring his eldest daughter to "keep it as quote our little secret", it is hardly unsupported supposition as the Government would have this Court accept.

Other examples of objective facts ignored by the Government in its sentencing memo include the following:

At FN6 of the Government's sentencing memo, it rejects Jamie Orsini's explanation of the overlap in time when she lived with Steven Kraft and was involved in a romantic relationship with Nicholas Orsini. (Government Sentencing Memo, p. 4-5). The Government suggests that if Jamie Orsini ended the romantic relationship with Mr. Kraft in 2008 but her daughter with Mr. Kraft was born in 2009, the two of them must have been in a romantic relationship in 2009 (notwithstanding the generally accepted rule of trusts and estates law that gestation for human beings is 9 months, notwithstanding whatever "romantic relationship" two adult humans may be involved in. It is their conclusion, "In other words, Jamie has proven an unreliable narrator", which is dramatic and unsupported by facts. (See also FN 7, Government Sentencing Memo, p. 5, which waives away 35 years of history of physical, mental, and sexual abuse suffered by Jamie Orsini with the repeated phrase "Needless to say, abuse, whether sexual or otherwise- is serious and terrible and the victims deserve sympathy. The problem here is that Jamie has proved such an unreliable narrator, frequently leveling accusations strategically, that it is difficult to discern which- if any – of Jamie's accusations have any merit.") Since one of the "accusations" of abuse by Nicholas Orsini resulted in his guilty plea to the crime of domestic abuse Attempted Assault (which is the source of his elevated criminal history), it would seem that one of the more pertinent "allegations" of Jamie Orsini is verified. (See Government Sentencing Memo, p. 26.)

The trial evidence showed that there were relevant conversations between Nicholas Orsini and the family's landlord that supported Jamie Orsini's belief that Nicholas was purchasing items and supplies that would be used to work on their apartment in exchange for a rent abatement. To reject this as possible, the Government would have to have this Court accept that the landlord was in on the conspiracy and sent texts to Nicholas Orsini that approved of this arrangement knowing that it was a rouse. There is zero evidence to support this at all. To the contrary, it appears from the text messages that the landlord accepted the work-for-rent premise, and thus why shouldn't Jamie Orsini also believe it? (See Cellebrite report, for the time range 2/7/20-4/14/20.) (See Government Sentencing Memo, pp. 10-11, See GX-16-J, attached.)

Regarding the disposal of Mr. Kraft's body (See Jamie Orsini PSR ¶39 and n.27, Nicholas Orsini PSR ¶39, Government Sentencing Memo, p. 17 and n.17), the Government continues to accept Nicholas Orsini's proffer that he was "intoxicated" and thus explain away why he can't remember where he buried Mr. Kraft's remains, notwithstanding that to do so, he had to drive the family 2 hours north of their home to the burial spot, spend an hour burying the body, and then drive 2 hours south back home, all while not drinking or getting stopped for DWI. There is NO evidence to support that he was intoxicated at this time.

But the Government's continued refusal to allow Jamie Orsini the same opportunity to assist in finding Mr. Kraft's remains, and which no doubt at the sentencing hearing the Government will repeat again that the Kraft family needs "closure", rings hollow in light of their persistence to not only not assist in that recovery, but to prevent the NYSP from that recovery. (See Defense Objections to PSR ¶39.) Further, the Government flatly misstates the record that "When law enforcement determined that it was Jamie attempted to reach out, it declined the invitation." (Government Sentencing Memo, p. 28.) Undersigned counsel spoke directly to the NYSP investigator, identified my client and the information offered, and was told that it was highly desired by the NYSP to find the remains of Mr. Kraft but that the United States Attorney's Office would need to approve any effort by Ms. Orsini to offer assistance. It was the USAO that rejected the offer, not "law enforcement."

Some allegations of the Government, though there may be an objective fact present, are mere cognitive bias. For example, it is true that after their arrest, the Family Court changed the custody arrangement of the Kraft and Orsini children. The speculation that the Orsini's arranged for the transfer of custody of the Kraft and Orsini children to Joanne Lloyd "thus preventing law enforcement from interviewing the children" seems to misunderstand the power of law enforcement and misstate the record. There is no evidence that Joanne Lloyd (or any person) prevented law enforcement from speaking with the children, obstructed the service of subpoenas, prevented Child Protective Services from speaking with the children, or *in any way* thwarted law enforcement from investigating this crime. Law enforcement could have interviewed the children using the power of the State any day they wanted in the year leading up to trial (as the Government admits that it *did in fact interview a Kraft daughter and an Orsini son on September 26,*

*2023*), and whatever choices it made are not evidence against Jamie Orsini. (See Government Sentencing Memo, pp. 21-22.)

Particularly disheartening about the Government's rejection of any bad acts by Mr. Kraft against his daughters, the younger daughter has repeatedly been hospitalized for self-harm, which she describes as related to abuse she suffered from her father and depression over the current situation. To accept the Government's version of events would be to dismiss the daughter's real attempts as self-harm as staged events to assist her mother, a view dismissed by the medical professionals who deemed the events significant enough to compel the daughter's involuntary commitment to a mental health facility for her own well-being. (Government Sentencing Memo, pp. 22-25.) Jamie Orsini asserts that her daughter told her that she had been abused by Mr. Kraft in a call while Jamie Orsini was at the MDC, in 2025, but that the daughter was at a medical facility [redacted] This call was at the courtesy of the BOP [redacted], and was not on the standard, recorded BOP inmate telephone line. (Government Sentencing Memo, p. 25). Since this call occurred well after Jamie and Nicholas Orsini's arrest, Nicholas Orsini's assertion that he knew of the abuse prior to the homicide of Steven Kraft can't be true (although he certainly would have been aware of the accusations by Jamie Orsini based upon Steven Kraft's admissions to the Family Court.)

Submitted with this memo are numerous photographs of the very real children of Jamie Orsini, and her with her children. Further, also attached are video clips of these children interviewed by Lyndsay Lewis, mitigation specialist, so that the Court can hear from them directly (given their young age.)

<u>The Government's Ignoring of Jamie Orsini's Substantial, Persistent, and Highly-Relevant History of Abuse.</u>

The reason that Jamie Orsini's history of trauma and abuse was offered is found directly in Dr. Walker's report. The very nature of 18 USC §3553(a) is that the history and characteristics of a defendant to be sentenced are of co-commensurate importance with the nature and circumstances of the offense itself. §3553(a)(1), before any other purpose is considered.

[redacted]

***

***

Dr. Walker used the professionally accepted *Violence Checklist* assessment to inventory the history of domestic and sexual violence. The list of abuse runs for three pages in her report (Walker, pp. 17-20). As discussed repeatedly (and ignored repeatedly by the Government in its sentencing submission), Dr. Walker makes the direct connection between the breadth, scope, persistence, and cruelty of the abuse and its impact on an individual who perceives that she has no available safe exit from this abuse. In her conclusion, Dr. Walker demonstrates her conclusion from the empiric evidence:

[5] Seligman, M. (1972). *Learned Helplessness.*

[6] Walker, L. (1984) *Battered Woman Syndrome. 1st Ed.* Springer. Walker, L. (2017) *Battered Woman Syndrome 4th Ed. Springer.*

Dr. Walker's final conclusion in her report, as an expert in her field, is as follows:

Jamie Orsini is the complete person who stands before the Court for sentencing. Not the straw person created by the Government, or merely the person identified in the indictment, or just the defendant convicted after trial. Who she was before all the events of the indictment took place is relevant and essential to this Court's evaluation of what the appropriate sentence should be. What she experienced before, during, and after the events of this case matter to what is the appropriate level of punishment for the crime of conviction. This Court has the *legal* authority to determine that this history isn't enough to merit a term of years instead of life without the possibility of parole. But this history and characteristics of Jamie Orsini has been offered to show that there is a sentence that is sufficient but not greater than necessary, which is less than life.

Finally, Ms. Orsini reaffirms the objections previously provided to Probation to the Final PSR, and seeks a ruling on all objections by this Court.

[7] Walker, L., Shapiro, D., Temares, A., Diaz, B. (Eds.)(2025). *Women Who Kill: Violence, Trauma, and Forensic Psychology.* Routledge.

Conclusion

I thank the Court for its consideration of our submissions.

Very truly yours,

*Sam Braverman*
Samuel M. Braverman, Esq.
National Co-Chair,
Government Enforcement,
Internal Investigations, and
White-Collar Defense Group